Citation Nr: 1527854 
Decision Date: 06/29/15 Archive Date: 07/09/15

DOCKET NO. 10-23 172 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Waco, Texas


THE ISSUES

1. Entitlement to an initial rating in excess of 10 percent prior to March 25, 2009, and in excess of 30 percent thereafter for migraine headaches.

2. Entitlement to an initial rating in excess of 10 percent for residuals of meniscus tear of the right knee prior to May 9, 2013.


REPRESENTATION

Veteran represented by: Disabled American Veterans


WITNESS AT HEARING ON APPEAL

The Veteran



ATTORNEY FOR THE BOARD

M. McPhaull, Counsel


INTRODUCTION

The Veteran had active service from June 1971 to May 1978, and from October 1990 to June 1991. 

These matters come before the Board of Veterans' Appeals (Board) on appeal from rating decisions issued by the Department of Veterans Affairs (VA) Regional Office (RO) in Waco, Texas.

Where, as is the case here with respect to the increased rating claim for headaches, an award of service connection for a disability has been granted and the assignment of an initial disability evaluation is disputed, separate evaluations may be assigned for separate periods of time based on the facts found. In other words, the evaluations may be "staged". As such, that claim is characterized as "initial" as shown on the title page of this decision. Fenderson v. West, 12 Vet. App. 119, 125-126 (1999).

For purposes of clarification, the Board observes that the increased rating claim involving the right knee disability is also an initial rating claim. Service connection was granted for a right knee disability in a February 2005 rating action, at which time a noncompensable evaluation was assigned effective from September 3, 2004. That decision was not appealed. The Veteran filed an increased rating claim on October 3, 2007. Thereafter, in a May 2010 rating decision, the RO assigned a 10 percent evaluation for the right knee, effective from September 3, 2004, the date of the original claim. Accordingly, the claim is, in effect, an appeal of the initial rating assigned. 

In November 2012, the Veteran provided testimony at a hearing before the undersigned Veterans Law Judge sitting at the VA Regional Office in Waco, Texas. A transcript of that hearing is on file.

In February 2013, the Board denied an initial rating in excess of 10 percent prior to March 25, 2009, for the Veteran's migraine headache disability, and granted a 30 percent rating, but no higher, as of March 25, 2009, for such disability. The initial rating for the Veteran's right knee disability was remanded for further development. The Veteran appealed the decision relevant to his headache disability to the United States Court of Appeals for Veterans Claims (Court). In February 2014, the Court granted the Secretary and the Veteran's (the parties) Joint Motion for Partial Remand (Joint Motion). As such, the Board's decision, to the extent that it denied entitlement to an initial rating in excess of 10 percent prior to March 25, 2009, and in excess of 30 percent thereafter for migraine headaches was vacated and remanded pursuant to the Joint Motion.

As noted, in February 2013 the Board remanded the Veteran's claim pertinent to his right knee disability. In a May 2013 rating decision, the agency of original jurisdiction (AOJ) assigned a separate 10 percent rating for right knee instability. Further, a separate 30 percent rating was assigned for limited extension of the right knee. Both ratings were effective from May 9, 2013, the date of the most recent VA examination. 

In September 2014, the Board denied an initial rating in excess of 10 percent for residuals of meniscus tear of the right knee and found the assignment of the separate 30 percent and 10 percent ratings for limited extension and instability of the right knee, respectively, as of May 9, 2013, to be proper. The migraine headache disability was remanded for further development consistent with the February 2014 Joint Motion. The Veteran appealed the decision relevant only to the initial 10 percent rating assigned for the right knee meniscus tear prior to May 9, 2013 to the Court. In March 2015, the Court granted the parties' Joint Motion as to such issue. The Joint Motion further stated that the Veteran was not pursuing the issues regarding the other ratings assigned for his right knee disability and the September 2014 Board decision should be affirmed as to such issues. Therefore, these issues are no longer in appeal status. Therefore, the September 2014 Board decision, to the extent that it denied an initial rating in excess of 10 percent for residuals of meniscus tear of the right knee prior to May 9, 2013, was partially vacated and remanded pursuant to the Joint Motion. Consequently, such issue now returns to the Board for further consideration consistent with the Joint Motion.

The Board notes that, while all evidence of record has been considered by the AOJ in connection with the Veteran's headache claim with the most recent supplemental statement of the case issued in February 2015, the AOJ has not reviewed the record relevant to the Veteran's right knee disability since the issuance of the May 2013 supplemental statement of the case. Since such time, additional VA treatment records dated from January 2013 through February 2015 have been obtained and the Veteran has not waived AOJ consideration of such evidence. However, the Board finds no prejudice to the Veteran in proceeding with a decision on the right knee issue at this time as such additional records do not contain findings referable to the right knee different than those previously of record and considered for the period prior to May 9, 2013, and, as such, are irrelevant. 38 C.F.R. § 20.1304(c) (2014).

As a final preliminary matter, the Board notes that, this appeal is now being processed using the Veterans Benefits Management System (VBMS) and Virtual VA paperless claims processing systems.


FINDINGS OF FACT

1. For the entire period on appeal, the Veteran's migraine headaches are characterized by prostrating attacks occurring on average at least once per month, with symptoms including nausea, photophobia, and phonophobia, and necessitate lying in a dark room with ice packs. 

2. At no time during the appeal period, has the Veteran's headaches more nearly approximated very frequent completely prostrating and prolonged attacks productive of severe economic inadaptability. 

3. Since the September 3, 2004 award of service connection, the Veteran's residuals of a meniscus tear of the right knee results in subjective complaints of pain, tenderness, stiffness, effusion, and locking, and objective evidence of painful motion with functional loss causing limitation of flexion to no more than 80 degrees, even in consideration of additional functional loss due to flare-ups of pain, fatigability, incoordination, pain on movement, and weakness, or on repetitive motion; without evidence of limitation of extension prior to May 9, 2013; instability or subluxation prior to May 9, 2013; ankylosis; dislocation of semilunar cartilage; additional symptoms as a result of the removal of semilunar cartilage; impairment of the tibia or fibula; genu recurvatum; or scarring that is symptomatic or of a size to warrant a separate compensable rating.


CONCLUSIONS OF LAW

1. The criteria for an initial 30 percent rating for the entire appeal period, but no higher, for migraine headaches have been met. 38 U.S.C.A. §§ 1155, 5107 (West 2014); 38 C.F.R. §§ 3.321, 4.1, 4.3, 4.7, 4.124a, Diagnostic Code 8100 (2014).

2. The criteria for an initial rating in excess of 10 percent prior to May 9, 2013, for residuals of a meniscus tear of the right knee have not been met. 38 U.S.C.A. §§ 1155, 5107 (West 2014); 38 C.F.R. §§ 3.321, 4.1, 4.3, 4.7, 4.10, 4.40, 4.45, 4.59, 4.71, 4.71a, Diagnostic Code 5260 (2014).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

I. VA's Duties to Notify and Assist

The Veterans Claims Assistance Act of 2000 (VCAA) and implementing regulations impose obligations on VA to provide claimants with notice and assistance. 38 U.S.C.A. §§ 5102, 5103, 5103A, 5107 (West 2014); 38 C.F.R §§ 3.102, 3.156(a), 3.159, 3.326(a) (2014). Proper VCAA notice must inform the claimant of any information and evidence not of record (1) that is necessary to substantiate the claim; (2) that VA will seek to provide; and (3) that the claimant is expected to provide. 38 U.S.C.A. § 5103(a); 38 C.F.R. § 3.159(b)(1). 

In Dingess/Hartman v. Nicholson, 19 Vet. App. 473 (2006), the Court held that the VCAA notice requirements of 38 U.S.C.A. § 5103(a) and 38 C.F.R. § 3.159(b) apply to all five elements of a service connection claim. Those five elements include: 1) Veteran status; 2) existence of a disability; 3) a connection between the Veteran's service and the disability; 4) degree of disability; and 5) effective date of the disability. 

In Pelegrini v. Principi, 18 Vet. App. 112 (2004), the Court held that a VCAA notice, as required by 38 U.S.C.A. § 5103(a), must be provided to a claimant before the initial unfavorable AOJ decision on the claim for VA benefits. 

In connection with the Veteran's claim for service connection for a right knee disability, an October 2004 letter, sent prior to the initial unfavorable decision issued in February 2005, advised the Veteran of the evidence and information necessary to substantiate his service connection claim. Additionally, he was advised of the evidence and information necessary to substantiate increased rating claim prior to the issuance of the April 2008 and May 2010 rating decisions that, collectively, awarded an initial 10 percent rating as of September 3, 2004. Such letters also notified him of his and VA's respective responsibilities in obtaining the evidence and information needed to substantiate his claim. Relevant to the headaches, a letter sent to the Veteran dated in December 2007 addressed the elements of service connection prior to the grant of service connection for migraine headaches. Additionally, the December 2007 letter advised him of the information and evidence necessary to establish a disability rating and an effective date in accordance with Dingess/Hartman, supra. 

Moreover, while the right knee claim was not originally considered to be an initial rating claim, in light of the RO's actions in the May 2010 rating decision, the propriety of the initially assigned rating for the Veteran's right knee disability, and the propriety of the initially assigned rating for the Veteran's headaches, are on appeal from the original grant of service connection. VA's General Counsel has held that no VCAA notice is required for such downstream issues. VAOPGCPREC 8-2003, 69 Fed. Reg. 25180 (May 5, 2004). In addition, the Board notes that the Court held that "the statutory scheme contemplates that once a decision awarding service connection, a disability rating, and an effective date has been made, § 5103(a) notice has served its purpose, and its application is no longer required because the claim has already been substantiated." Dingess v. Nicholson, 19 Vet. App. 473, 490 (2006). Therefore, as the Veteran has appealed with respect to the initially assigned rating, no additional 38 U.S.C.A. § 5103(a) notice is required because the purpose that the notice is intended to serve has been fulfilled. Hartman v. Nicholson, 483 F.3d 1311 (Fed. Cir. 2007); Dunlap v. Nicholson, 21 Vet. App. 112 (2007). 

Relevant to the duty to assist, the Veteran's service treatment records as well as post-service VA and private treatment records have been obtained and considered. The Veteran has not identified any additional, outstanding records that have not been requested or obtained. Moreover, the Veteran's statements in support of his claims are of record. The Board has carefully reviewed such statements and concludes no available outstanding evidence has been identified. The Board has also perused the medical records for references to additional treatment reports not of record, but has found nothing to suggest that there is any outstanding evidence with respect to the Veteran's claims.

Furthermore, in February 2005, March 2007, February 2008, May 2013, and December 2014 the Veteran was provided VA examinations in connection with his initial rating claims. Neither the Veteran nor his representative have alleged that such are inadequate for rating purposes. Moreover, the Board finds that the examinations are adequate in order to evaluate the Veteran's service-connected right knee and headache disabilities as they include an interview with the Veteran, a review of the record, and a full physical examination, addressing the relevant rating criteria. Therefore, the Board finds that the examination reports of record are adequate to adjudicate the Veteran's initial rating claims and no further examination is necessary.

The Veteran also offered testimony before the undersigned Veterans Law Judge at a Board hearing in July 2012. In Bryant v. Shinseki, 23 Vet. App. 488 (2010), the Court held that 38 C.F.R. § 3.103(c)(2) requires that the Decision Review Officer or Veterans Law Judge who chairs a hearing to fulfill two duties: (1) the duty to fully explain the issues and (2) the duty to suggest the submission of evidence that may have been overlooked. 

Here, during the July 2012 hearing, the undersigned Veterans Law Judge noted the issues on appeal. Also, information was solicited regarding the nature and severity of the Veteran's right knee and headache disabilities, to include the impact such has on his daily life and employment. Therefore, not only were the issues "explained . . . in terms of the scope of the claims for benefits," but "the outstanding issues material to substantiating the claim," were also fully explained. See Bryant, 23 Vet. App. at 497. As the hearing discussion raised the possibility that there were outstanding treatment records available from a private treatment provider, Dr. Uriegas, and through the VA healthcare system, the Board remanded the right knee claim in February 2013 in order to obtain such records. Additionally, as determined by the Board, updated VA examinations were necessary, which were obtained in May 2013 for the right knee. Furthermore, after the Court's February 2014 Joint Motion, the Board sought additional development with respect to the Veteran's headaches, to include obtaining a VA examination with a retrospective opinion and allowing the Veteran an opportunity to identify additional treatment records referable to such disability. Under these circumstances, nothing gives rise to the possibility that evidence had been overlooked with regard to the Veteran's claims. As such, the Board finds that, consistent with Bryant, the undersigned Veterans Law Judge complied with the duties set forth in 38 C.F.R. 3.103(c)(2) and that the Board may proceed to adjudicate the claim based on the current record.

The Board further finds that there was substantial compliance with the February 2013 and September 2014 remand directives. A remand by the Board confers upon the claimant, as a matter of law, the right to compliance with the remand order. Stegall v. West, 11 Vet. App. 268 (1998). Nonetheless, it is only substantial compliance, rather than strict compliance, with the terms of a remand that is required. See D'Aries v. Peake, 22 Vet. App. 97, 104 (2008) (finding substantial compliance where an opinion was provided by a neurologist as opposed to an internal medicine specialist requested by the Board); Dyment v. West, 13 Vet. App. 141 (1999). 

In particular, the Board in February 2013 directed the AOJ to provide an opportunity to submit, or request that VA obtain any additional records relevant to his right knee disability, to specifically include those from Dr. Uriegas. Further, the AOJ was to obtain VA treatment records dated from August 2012 forward. Despite being requested to do so in a March 2013 letter, the Veteran did not identify any additional private treatment records or submit authorization forms so as to allow VA to request such records, to include those from Dr. Uriegas. VA treatment records dated through May 2013 were subsequently uploaded to his Virtual VA file. Further, the AOJ was also directed to schedule the Veteran for a VA examination. As noted above, the Veteran was afforded a VA examination in May 2013 that is adequate for appellate review. 

Moreover, the Board in September 2014 directed the AOJ to provide the Veteran with another opportunity to identify any outstanding treatment records referable to his headaches and, thereafter, to schedule him for a VA examination with a retrospective medical opinion. Thereafter, in an October 2014 letter, the Veteran was requested to identify or submit any outstanding VA or non-VA treatment records. While the Veteran did not reply to such letter, the AOJ subsequently obtained VA treatment records dated through February 2015. Additionally, as previously noted, the Veteran was afforded a VA examination in December 2014 that is adequate for appellate review.

Accordingly, the Board finds that there has been substantial compliance with the February 2013 and September 2014 Board remand directives and, therefore, no further remand is necessary. See Stegall, supra; D'Aries, supra.

Thus, the Board finds that VA has fully satisfied the duty to assist. In the circumstances of this case, additional efforts to assist or notify the Veteran in accordance with the VCAA would serve no useful purpose. See Soyini v. Derwinski, 1 Vet. App. 540, 546 (1991) (strict adherence to requirements of the law does not dictate an unquestioning, blind adherence in the face of overwhelming evidence in support of the result in a particular case; such adherence would result in unnecessarily imposing additional burdens on VA with no benefit flowing to the appellant); Sabonis v. Brown, 6 Vet. App. 426, 430 (1994) (remands which would only result in unnecessarily imposing additional burdens on VA with no benefit flowing to the appellant are to be avoided). VA has satisfied its duty to inform and assist the Veteran at every stage in this case, at least insofar as any errors committed were not harmful to the essential fairness of the proceeding. Therefore, he will not be prejudiced as a result of the Board proceeding to the merits of his claims.

II. Analysis

Disability ratings are determined by applying the criteria set forth in the VA Schedule for Rating Disabilities, found in 38 C.F.R., Part 4. The rating schedule is primarily a guide in the evaluation of disability resulting from all types of diseases and injuries encountered as a result of or incident to military service. The ratings are intended to compensate, as far as can practicably be determined, the average impairment of earning capacity resulting from such diseases and injuries and their residual conditions in civilian occupations. 38 U.S.C.A. § 1155; 38 C.F.R. § 4.1. 

Where there is a question as to which of two evaluations shall be applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria for that rating. Otherwise the lower rating will be assigned. 38 C.F.R. § 4.7. All benefit of the doubt will be resolved in the Veteran's favor. 38 C.F.R. §4.3.

In general, all disabilities, including those arising from a single disease entity, are rated separately, and all disability ratings are then combined in accordance with 38 C.F.R. § 4.25. Pyramiding, the evaluation of the same disability, or the same manifestation of a disability, under different diagnostic codes, is to be avoided when rating a Veteran's service-connected disabilities. 38 C.F.R. § 4.14. It is possible for a Veteran to have separate and distinct manifestations from the same injury which would permit rating under several diagnostic codes, however, the critical element in permitting the assignment of several ratings under various diagnostic codes is that none of the symptomatology for any one of the conditions is duplicative or overlapping with the symptomatology of the other condition. See Esteban v. Brown, 6 Vet. App. 259, 261-62 (1994). 

The Veteran's entire history is reviewed when making disability evaluations. See generally 38 C.F.R. § 4.1; Schafrath v. Derwinski, 1 Vet. App. 589 (1991). Where, as here, the question for consideration is the propriety of the initial evaluation assigned, consideration of the evidence since the effective date of the award of service connection and consideration of the appropriateness of a staged rating are required. See Fenderson v. West, 12 Vet. App. 119, 126 (1999). The effective dates of the award of service connection for residuals of right knee meniscus tear and the headache disability is September 3, 2004. As previously discussed, the period of consideration on appeal for the Veteran's right knee disability is from September 3, 2004 to May 9, 2013. Further, a 30 percent disability rating is assigned for migraine headaches, effective from March 25, 2009. Both stages for migraine headaches are under consideration. Thus, the Board will evaluate the propriety of the assigned ratings since such dates.

A. Headaches

The Veteran's service-connected migraine headaches have been assigned initial 10 percent and 30 percent disability ratings prior to and from March 25, 2009, respectively, pursuant to 38 C.F.R. § 4.124a, Diagnostic Code 8100 (2014). 

The provisions of 38 C.F.R. § 4.124a, Diagnostic Code 8100, provide for a 50 percent rating for migraine with very frequent completely prostrating and prolonged attacks productive of severe economic inadaptability. A 30 percent rating is assigned for migraine with characteristic prostrating attacks occurring on an average once a month over last several months. A 10 percent rating is provided for migraine with characteristic prostrating attacks averaging one in 2 months over last several months.

The rating criteria do not define "prostrating;" nor has the Court. Cf. Fenderson v. West, 12 Vet. App. 119 (1999) (in which the Court quotes Diagnostic Code 8100 verbatim but does not specifically address the matter of what is a prostrating attack). By way of reference, the Board notes that according to WEBSTER'S NEW WORLD DICTIONARY OF AMERICAN ENGLISH, THIRD COLLEGE EDITION (1986), p. 1080, "prostration" is defined as "utter physical exhaustion or helplessness." A very similar definition is found in DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1367 (28th Ed. 1994), in which "prostration" is defined as "extreme exhaustion or powerlessness."

Also, the term "productive of severe economic adaptability" has not been clearly defined by regulations. The Court has, however, explained that "productive of" for purposes of Diagnostic Code 8100 can either mean producing, or capable of producing. See Pierce v. Principi, 18 Vet. App. 440, 445 (2004). Thus, migraines need not actually produce severe economic inadaptability to warrant a 50 percent rating under Diagnostic Code 8100. Id. at 445-46. Similarly, "economic inadaptability" does not equate to unemployability, as such would undermine the purpose of regulations pertaining to a total disability rating for compensation based on individual unemployability (TDIU). Id. at 446; see also 38 C.F.R. § 4.16. The Board notes, however, that the migraines must be, at a minimum, capable of producing severe economic inadaptability in order to meet the 50 percent criteria. 

A May 2005 private medical statement indicates that the Veteran had been treated by Dr. R.U. on numerous occasions between January 1992 and January 1999. A May 2005 record of Dr. L.B. reflects that the Veteran was seen for a 2 day history of headaches with nausea, assessed as migraines. 

In a November 2005 statement, the Veteran reported that, in May 2005, Dr. B. had given him Zomig spray for treatment of headaches. He also reported that, in November 2005, Dr. J. gave him an injection for his migraine headaches and prescribed Axert, Migquin, and Promethazine. 

In April 2006, Dr. R.U. provided a medical statement indicating that he had been treating the Veteran intermittently since 1997 for migraine headaches. It was noted that he had come for treatment with a previous diagnosis of migraines and had reported that these started in the military. It was further observed that the headaches were treated with medications such as Imitrex. Private medical records document complaints of headaches in November 2005, June 2006, August 2006, and January 2007.

A VA record of July 2006 documents a history of headaches since 1991, occurring once every 1 to 2 weeks, described as "global" and associated with photophobia and nausea. It was noted that this condition had been previously treated with Imitrex, but due to hypertension, it was now being treated with Excedrin migraine. He did not have a headache upon appointment. Migraine headaches were assessed.

A VA examination was conducted in March 2007 and the claims folder was reviewed. The history indicated that the Veteran had complained of migraine headaches in November 1990 during service and had acknowledged having recurrent headaches on a May 1991 physical examination form. It was also noted that he had been medically followed for headache symptoms since 1992. 

On examination, the Veteran reported that he got headaches 2 to 3 times a week, pulsating in nature, and associated with nausea, photophobia, and phonophobia. During headache episodes, the Veteran stated that he would take a Fioricet and the headache would resolve in a couple of hours, but he had to lie down in a dark room and was incapacitated in the meantime. It was noted that, about 4 times a year, he went to a private doctor for injections due to severe headaches which did not respond to pills (last seen in January 2007). The report mentioned that Fioricet was working as treatment. Migraine headaches were diagnosed and the examiner opined that it was more likely than not etiologically related by continuity to military service. 

Private medical records document that the Veteran was seen for complaints of headaches in August 2007, assessed as headache tension, variant migraine headache, and hypertension. He was seen for treatment of headaches in January 2007; August 2007 (3 day history), October 2007; November 2007 (associated with URI); January 2008 (3 day history), and February 2008 (intermittent headaches); (see also February 2008 statement of Dr. R.U.).

In a March 2009 statement from the Veteran, he indicated that he had filed for Family Medical Leave Act (FMLA) status at his job. He mentioned that he had recently been seen by a VA neurologist and that Divalproex had been prescribed. 

A VA neurology consultation record of March 25, 2009 indicates that the Veteran complained of frequent headaches since 1991, described as throbbing. He indicated that he experienced headaches at least once a week, and reported that these occasionally lasted for 48 hours. He stated that he experienced mild headaches twice a week which were relieved by Excedrin. It was noted that at times he missed work due to headaches. The physician determined that the neurological examination was normal and that the Veteran's headaches were consistent with migraine without aura. It was noted that he was also experiencing tension headaches which at times evolved into migraines. It was concluded that the frequency, severity, and duration of symptoms warranted preventive treatment and a trial of Depakote was recommended.

The file contains the Veteran's FMLA application dated in April 2009 identifying migraine headaches as the primary disability. The report indicated that the Veteran experienced headache episodes 1 to 2 times a month, requiring 1 to 3 days of leave per episode. 

In April 2009, Dr. R.U. offered a statement for the file indicating that the Veteran had been treated on March 2009, and mentioning that there were times when he self-treated migraines without seeing a physician. 

When seen by VA neurology in September 2009, the Veteran reported that his headaches were under fair control. He mentioned having 1 to 2 headaches a week, mostly relived with over the counter medication. It was noted that he remained on Depakote for migraine prevention. In March 2010, the Veteran was seen for another VA neurology consultation. At that time, he reported having 2 episodes of migraine headaches since September 2009, aborted with Zolmitriptan. An impression of migraine without aura under good control was made, with mention of only 2 headache episodes during the past 6 months. 

In April 2010, Dr. R. U. offered a statement for the record indicating that he had treated the Veteran for headaches on: February 2008, February 2009, March 2009, July 2009, October 2009, and February 2010.

The Veteran's wife also provided a statement indicating that the Veteran had suffered from headaches since service and that post-service he sometimes received injections for treatment. She also confirmed that he had applied for FMLA status at work due to this condition.

In a May 2010 rating action, service connection was established for migraine headaches, for which an initial 10 percent evaluation was assigned effective from September 3, 2004.

In an August 2010 statement, the Veteran indicated that he believed that his headaches had increased in severity. 

Records from Dr. R.U. reflect treatment for headaches in February 2010 (mixed), and August 2010 (chronic, mild). 

A VA neurology note of September 23, 2010 indicates that the Veteran reported having an increase in his headache frequency during the past 4 months. It was noted that he was experiencing 2 to 3 headaches a week, described as throbbing, and that he was still taking Divalproex. 

A VA neurological examination was conducted in January 2011 and the claims folders were reviewed. The Veteran complained of having migraines for years. He reported that the condition was stable until about 6 months previously when they increased in severity. The report mentioned that a records review showed that the Veteran had been seen in March 2010 by Dr. E., at which time he reported having just 2 headache episodes during the past 6 months; in contrast, it was documented that when seen again by Dr. E. in September 2010, he reported that headaches were occurring 3 times a week. 

On examination, the Veteran reported that he had been having 3 to 4 headaches a week for the past 6 months, accompanied by throbbing pain. He indicated that the headaches last for 4 hours to all day, and described himself as incapacitated until the headache went away. The Veteran stated that he worked full-time and had not missed any work at the post office for the past 2 months, but had missed 6 to 7 days during the past year due to headaches. Treatment with the medications Depakote, Maxalt, and Excedrin was reported. Migraine headaches, symptomatic with residuals was diagnosed.

A VA neurology note of February 2011, indicates that the Veteran had experienced a recent flare-up of headaches since September 2010. When seen in June 2011, it was noted that his headaches were under good control on 2 medications. 

The file contains the Veteran's FMLA application information dated January 2011, indicating that he had been approved for FMLA status, due to a history of intermittent migraine headaches. His physician certified that headaches occurred 1 to 2 times a month, lasting for 1 to 3 days per episode. 

Leave records from the Veteran's employer show that he missed 6 days of work due to headaches during 2010; and 8 days during 2011.

The Veteran presented testimony at a Board hearing held in July 2012. He indicated that he was experiencing migraine headache 3 times a week, and indicated that once or twice a month he had to lay down in a dark room with ice packs. He estimated that he had experienced incapacitating headaches 6 to 7 times during the past year. He mentioned that he was under treatment through VA for headaches. The transcript reflects that the Veteran was employed as a mail handler and indicated that the headaches interfered with his employment, to the extent that he had to take medication. He estimated that he missed one day of work every 2 months due to headaches. 

VA treatment records includes a March 2012 neurology note indicating that the reflects that Veteran reported having more frequent migraines, occurring 2 to 3 times a week, and at work. A July 2012 entry indicates that since last seen in March 2012, the Veteran reported improvement of the headache frequency with an increased Divalproex dose.

On December 2014 VA examination, the Veteran reported severe headaches about once a month lasting most of the day, and less severe headaches about once a month. He indicated that he was currently having incapacitating headaches about once "every couple months" lasting half to all day. The examiner opined that there had been no significant change in the Veteran's headaches since his last VA examination. The examiner noted that the Veteran's headaches do not produce severe economic inadaptability. He noted that the Veteran reported currently missing about a half to one full day of work every two months. The examiner noted that the Veteran currently had no functional limitations except for every two months when for one half to a full day he was limited to bedrest.

Based on the foregoing, the Board finds an initial rating of 30 percent, but no higher, for the entire appeal period is warranted.

In this regard, private treatment records document complaints of/treatment for headaches in November 2005, June 2006, August 2006 and January 2007, indicating that prostrating attacks did not occur on an average once a month over a duration of several months. The Board notes, however, on examination of March 2007, the Veteran reported that he experiences headaches 2 to 3 times a week, pulsating in nature, and associated with nausea, photophobia, and phonophobia. He indicated that the headaches would resolve in a couple of hours. 

Pursuant to the September 2014 Board remand, a retrospective opinion was sought in December 2014. The examiner reviewed the entire claims file and noted, in part, that since 2004 the frequency of the Veteran's migraine headaches had varied from twice a month to monthly. He indicated that the Veteran has had characteristic prostrating attacks occurring on an average of once a month over a several month time period.

In light of all of the evidence of record, the Board finds that the evidence is in relative equipoise as to whether the Veteran has at least one migraine per month that is "prostrating," as required for a 30 percent rating under Diagnostic Code 8100. He reported nausea with migraines and has reported since May 2007 that his symptoms include nausea and vision changes and necessitate lying in a quiet room. Moreover, the most recent December 2014 VA examiner indicated that, since 2004, the Veteran's migraine headaches have varied from twice a month to monthly; and such are prostrating.

The Board does acknowledge that the treatment records dated in November 2005, June 2006, August 2006 and January 2007, indicated that prostrating attacks did not occur on an average once a month over a duration of several months. At the same time, however, the Veteran has consistently reported in his statements and testimony the same symptoms of nausea, vision changes, and having to lie down in a dark, quiet room with ice packs. In this particular case, the Board finds that the Veteran is competent to report whether he needs to lie down in a dark, quiet room due to his migraines, as well as whether he experiences nausea and vision changes. This type of symptomatology appears largely subjective. Therefore, the Board will resolve all doubt in the Veteran's favor and grant the claim for a 30 percent rating for the entire appeal period.

The Board further finds that the criteria for a higher rating under Diagnostic Code 8100 have not been met. As explained above, the criteria for a 50 percent rating include very frequent completely prostrating and prolonged attacks productive of severe economic inadaptability. As shown above, the evidence of record as a whole, including several of the Veteran's own statements, mostly reflects that the Veteran has experienced one to two migraines per month during the period on appeal, but certainly not "very frequent." Also, there is no evidence suggesting they are productive of "severe economic inadaptability." While the Veteran was approved for FMLA due to his headaches, such was noted that his physician certified that headaches occurred 1 to 2 times a month, lasting for 1 to 3 days per episode. Leave records from the Veteran's employer show that he missed only 6 days of work due to headaches during 2010; and only 8 days during 2011. Moreover, on the most recent December 2014 VA examination, the Veteran reported severe headaches about once a month lasting most of the day, and less severe headaches about once a month. He indicated that he was currently having incapacitating headaches about once "every couple months" lasting half to all day. The examiner opined that there had been no significant change in the Veteran's headaches since his last VA examination. The examiner noted that the Veteran's headaches do not produce severe economic inadaptability. He noted that the Veteran reported currently missed about a half to one full day of work every two months. The examiner noted that the Veteran currently had no functional limitations except for every two months when for one half to a full day he was limited to bedrest. The Board observes, the Veteran continues to be employed at the Post Office.

In summary, the criteria for a 30 percent evaluation, but no higher, have been met for the entire appeal period, and to this extent, with application of the benefit-of the-doubt doctrine, the appeal is granted. 

B. Right Knee Disability

Disability of the musculoskeletal system is primarily the inability, due to damage or infection in the parts of the system, to perform the normal working movements of the body with normal excursion, strength, speed, coordination, and endurance. It is essential that the examination on which ratings are based adequately portray the anatomical damage and the functional loss with respect to all of these elements. In evaluating disabilities of the musculoskeletal system, it is necessary to consider, along with the schedular criteria, functional loss due to flare-ups of pain, fatigability, incoordination, pain on movement, and weakness. DeLuca v. Brown, 8 Vet. App. 202 (1995).

Functional loss may be due to absence of part, or all, of the necessary bones, joints and muscles, or associated structures, or to deformity, adhesions, defective enervation, or other pathology, or it may be due to pain, supported by adequate pathology and evidenced by visible behavior of the claimant undertaking the motion. Weakness is as important as limitation of motion, and a part that becomes painful on use must be regarded as seriously disabled. 38 C.F.R. §§ 4.10, 4.40, 4.45. The Court has held that VA must analyze the evidence of pain, weakened movement, excess fatigability, or incoordination and determine the level of associated functional loss under 38 C.F.R. § 4.40, which requires VA to regard as "seriously disabled" any part of the musculoskeletal system that becomes painful on use. See DeLuca, supra. In Mitchell v. Shinseki, 25 Vet. App. 32 (2011), the Court held that, although pain may cause a functional loss, "pain itself does not rise to the level of functional loss as contemplated by VA regulations applicable to the musculoskeletal system." Rather, pain may result in functional loss, but only if it limits the ability "to perform the normal working movements of the body with normal excursion, strength, speed, coordination, or endurance." Id., quoting 38 C.F.R. § 4.40. 

Furthermore, the intent of the rating schedule is to recognize painful motion with joint or periarticular pathology as productive of disability. Thus, actually painful, unstable, or malaligned joints, due to healed injury, are entitled to at least the minimum compensable rating for the joint. The joints should be tested for pain on both active and passive motion, in weight-bearing and non-weight-bearing and, if possible, with the range of the opposite undamaged joint. 38 C.F.R. § 4.59. In Burton v. Shinseki, 25 Vet. App. 1, 5 (2011), the Court found that, when 38 C.F.R. § 4.59 is raised by the claimant or reasonably raised by the record, even in non-arthritis context, the Board should address its applicability.

Normal range of knee motion is 140 degrees of flexion and zero degrees of extension. 38 C.F.R. § 4.71, Plate II.

Limitation of motion of the knee is contemplated in 38 C.F.R. § 4.71a, Diagnostic Codes 5260 and 5261. Diagnostic Code 5260 provides for a zero percent evaluation where flexion of the leg is only limited to 60 degrees. For a 10 percent evaluation, flexion must be limited to 45 degrees. For a 20 percent evaluation is warranted where flexion is limited to 30 degrees. A 30 percent evaluation may be assigned where flexion is limited to 15 degrees. 

Diagnostic Code 5261 provides for a zero percent evaluation where extension of the leg is limited to five degrees. A 10 percent evaluation requires extension limited to 10 degrees. A 20 percent evaluation is warranted where extension is limited to 15 degrees. A 30 percent evaluation may be assigned where the evidence shows extension limited to 20 degrees. For a 40 percent evaluation, extension must be limited to 30 degrees. And finally, where extension is limited to 45 degrees a 50 percent evaluation may be assigned. 

VA's General Counsel has also stated that separate ratings under Diagnostic Code 5260 (limitation of flexion of the leg) and Diagnostic Code 5261 (limitation of extension of the leg) may be assigned for disability of the same joint. VAOPGCPREC 9-04 (September 17, 2004), published at 69 Fed. Reg. 59,990 (2004). 

Additionally, 38 C.F.R. § 4.71a, Diagnostic Code 5257, provides for assignment of a 10 percent rating when there is slight recurrent subluxation or lateral instability. A 20 percent rating is assigned when there is moderate recurrent subluxation or lateral instability, and a 30 percent rating is warranted for severe recurrent subluxation or lateral instability. 

VA's General Counsel has stated that when a knee disorder is rated under 38 C.F.R. § 4.71a, Diagnostic Code 5257 and an appellant also has limitation of knee motion which at least meets the criteria for a noncompensable evaluation under 38 C.F.R. § 4.71a, Diagnostic Code 5260 or 5261, separate evaluations may be assigned for arthritis with limitation of motion and for instability. However, General Counsel stated that if an appellant does not meet the criteria for a noncompensable rating under either Diagnostic Code 5260 or Diagnostic Code 5261, there is no additional disability for which a separate rating for arthritis may be assigned. VAOPGCPREC 23-97 (July 1, 1997), published at 62 Fed. Reg. 63,604 (1997). If a rating is assigned under the provisions for other knee impairment (38 C.F.R. § 4.71a, Code 5257) a separate 10 percent rating may be assigned where some limitation of motion, albeit noncompensable, has been demonstrated. See VAOPGCPREC 9-98, 63 Fed. Reg. 56,704 (1998).

The rating schedule also provides that dislocation of semilunar cartilage, with frequent episodes of "locking," pain, and effusion into the joint, warrants a 20 percent evaluation. 38 C.F.R. § 4.71a, Diagnostic Code 5258.

Diagnostic Code 5259 provides for the assignment of a maximum 10 percent rating based on symptomatic removal of the semilunar cartilage.

Records from the Central Texas VA Medical Center (VAMC) and private providers show regular treatment for complaints of right knee pain during the rating period on appeal. In this regard, a VA medical record dated in September 2009 reflects that an assessment of post traumatic degenerative joint disease of the right knee, with locking, was made. A January 2011 record indicates that the Veteran complained of right knee pain, worse in cold weather, and that he was ambulating with a limp and had a hinged knee brace. Good range of motion, tenderness, and stability to maneuvers were noted. Post traumatic degenerative joint disease of the right knee, with locking, was again assessed. In a statement provided from the Veteran in March 2012, he indicated that he suffered from episodes of locking, pain, and effusion in the joint. A private medical report of July 2012 shows that X-ray films of the right knee revealed mild degenerative changes at the patellofemoral joint. 

In this regard, the Veteran initially underwent a VA examination of his right knee in February 2005. He reported experiencing constant dull pain of the knee with increased pain with prolonged standing, walking, and prolonged positioning. He denied a history of swelling, inflammation, or instability. He complained of right knee locking. Physical examination of the right knee revealed no swelling, effusion, or ligament instability. There was no tenderness to palpation. Range of motion of the right knee was from zero to 140 degrees without noted pain. The examiner stated that there was no pain on motion. The examiner also noted that the right knee was stable anterior, posterior, and laterally. McMurray's and Lachman's test were negative. X-ray revealed early stage degenerative joint disease (DJD) of the right knee. The diagnoses were old meniscus tear, right knee; status post arthroscopic partial meniscectomy; and DJD right knee.

The Veteran underwent another VA examination in March 2007. During such examination, he reported that he experiences chronic right knee pain with flare up of pain about 2-3 times per week that is brought on by twisting, bending, or prolonged sitting. He reported a sensation of locking in the right knee. The Veteran indicated that he did not experience any additional limitations during his flare ups. He further reported that he was currently employed as a mail handler at the post-office, and he indicated that he avoids heavy lifting and bending. He stated that he estimates missing work about once a month due to his right knee disability. Physical examination revealed no redness, swelling, warmth, or weakness of the right knee. It was noted that the Veteran's gait favored the right side and was able to walk on heels and toes; however, he could not squat too far. There was no noted ankyloses of the right knee. Range of motion of the right knee was from zero to 120 degrees with pain noted at 80 degrees to the end. McMurray's test was negative. X-ray revealed normal right knee. The examiner found that there was no additional limitation of joint function.

Another VA compensation examination was conducted in February 2008. The Veteran reported symptoms of constant pain at level 6 with intermittent stiffness, instability or giving way, and locking. He reported flare-ups to level 8 due to activity and can last 2 hours. He reported that his flare-ups are precipitated by prolonged walking and standing and alleviated with rest and pain medication. The Veteran reported that he was able to attend to his activities of daily living. On examination of the right knee, there was no effusion or ligamentous laxity. McMurray sign was negative; there was constant pain in the right knee with increase of pain at extreme range of motion; there was pain/tenderness on palpation of the right knee and on motion of the joints; the Veteran's gait was with a pronounced right limp; there was no noted ankylosis. Extension of the right knee was to zero degrees and flexion was to 100 degrees. The examiner stated that there was no change in pain, range of motion or additional limitation upon 3 repetitions of the range of motion. X-rays taken during the examination revealed normal right knee. The diagnosis was residuals of a right knee meniscus tear, moderate.

Pursuant to the February 2013 Board remand, the Veteran underwent an additional VA examination in May 2013. During the examination, the Veteran reported symptoms of frequent right knee pain described as throbbing. He stated that his pain increases with walking, and prolonged sitting such as driving. He reported that his right knee pain decreased with lying supine, relaxing, and with pain medication. The Veteran denied experiencing any flare-ups. Range of motion revealed right knee flexion to 95 degrees with painful motion noted at 95 degrees; extension to 25 degrees without evidence of painful motion. After three repetitions, right knee flexion was to 85 degrees, and right knee extension was to 25 degrees. There was no noted functional loss and/or functional impairment of the right knee. There was right knee pain with palpation. Muscle strength testing was normal. Lachman's test was normal; posterior drawer test was normal; there was 1+ medial-lateral instability. The examiner noted that the Veteran's right knee disability impacted his ability to work in that he estimates missing about 5-6 work days in the last 12 months due to the right knee disability. He denied receiving any accommodation for his knee condition for performing his work duties. The Veteran reported that he works at a slower pace at times, and receives assistance from his co-workers as needed. 

By way of background, a February 2005 rating decision awarded service connection for residuals of meniscus tear of the right knee as the Veteran's service treatment records reflect that he underwent a right knee scope with partial medial meniscectomy in May 1996. As such, the record reflects that the Veteran has a history of removal of part of the semilunar cartilage, i.e., the meniscus. However, there is no evidence of a dislocated or torn meniscus during the appeal period. As such, Diagnostic Code 5258 is inapplicable. Moreover, while the Veteran has symptoms, i.e., residuals, as a result of his removal of the semilunar cartilage in service, such are contemplated by the currently assigned ratings under Diagnostic Codes 5260, 5261, and 5257. Furthermore, pursuant to VAOPGCPREC 9-98, limitation of motion is contemplated in Diagnostic Code 5259, pertinent to the removal of the semilunar cartilage or meniscus. The opinion finds that such removal may resolve restriction of movement caused by tears and displacements of the menisci; however, the procedure may result in complications such as reflex sympathetic dystrophy, which can produce loss of motion. Therefore, the opinion states that limitation of motion is a relevant consideration under Diagnostic Code 5259. As such, to assign a separate 10 percent rating under Diagnostic Code 5259 would thus doubly compensate the Veteran for the same symptoms already considered in his ratings under Diagnostic Codes 5260 and 5261, and violate the rule against pyramiding. See 38 C.F.R. § 4.14; Esteban, supra. Therefore, the Board finds that the Veteran is not entitled to a separate rating under Diagnostic Code 5259.

As relevant to the Veteran's initial 10 percent rating for residuals of meniscus tear of the right knee under Diagnostic Code 5260 pursuant to limitation of flexion, the Board finds that, for the entire appeal period, he is not entitled to a higher rating under such Diagnostic Code. In this regard, the current 10 percent rating is assigned under Diagnostic Code 5260 for painful, limited motion of the right knee. Specifically, while the Veteran did not meet the criteria for even a zero percent rating based on limitation of flexion, as there had been at least some limited and painful flexion, a 10 percent rating was assigned. See Burton, supra; 38 C.F.R. § 4.59. However, at no time since the award of service connection does the evidence show that the Veteran had flexion limited to 45 degrees. Although flexion of the right knee has been less than normal, as it was measured to 80 degrees at its worst and in consideration of pain at the March 2007 VA examination, even a zero (noncompensable) percent level has not been shown despite the limited motion. This is so even with consideration of painful motion and other factors. The VA examiners essentially indicated that there was no additional pain, loss of motion, or fatigability during repetitive testing. While the evidence tends to show that the Veteran does experience some painful and limited motion, a higher rating is not warranted unless it actually results in additional functional loss. See Mitchell, 25 Vet. App. at 38-43; DeLuca, 8 Vet. App. at 204-7. In reaching this conclusion, the Board has considered the Veteran's subjective complaints, to include pain and locking; however, such do not result in functional loss beyond painful, limited motion. 

Pertaining to whether a separate rating under Diagnostic Code 5257 for lateral instability or recurrent subluxation is warranted prior to May 9, 2013, the Board finds that the evidence fails to show that the Veteran's right knee disability resulted in such symptomatology. In this regard, the evidence consistently shows that, prior to May 9, 2013, the Veteran's right knee was stable on examination. Specifically, in February 2005, there was no ligament instability on examination and the examiner specifically found that the right knee was stable anteriorly, posteriorly, and laterally. Likewise, at such time, in March 2007, and February 2008, diagnostic testing, to include McMurray's and Lachman's tests, were negative. In February 2008, there was no ligamentous laxity on examination. The Board notes that a January 2011 VA treatment record documents the Veteran walks with a limp and uses a hinged knee brace; however, objective testing at such time noted good range of motion and stability to maneuvers. There was no objective evidence of recurrent subluxation or lateral instability. Consequently, the objective evidence fails to show recurrent subluxation or lateral instability prior to May 9, 2013.

The Board acknowledges that, at his February 2008 VA examination, the Veteran reported that he occasionally experiences some instability and, in general, has alleged locking in the knee; however, as a layperson, he is not competent to objectively diagnose lateral instability or subluxation. In this regard, while he is competent to report that his knee feels unstable, gives way, or locks, and the Board finds no reason to doubt his credibility regarding such observations, there is no indication that he possesses the requisite knowledge to administer or interpret specialized testing that would reveal instability or subluxation. See Woehlaert v. Nicholson, 21 Vet. App. 456 (2007) (although the claimant is competent in certain situations to provide a diagnosis of a simple condition such as a broken leg or varicose veins, the claimant is not competent to provide evidence as to more complex medical questions). In this regard, the VA examiners prior to the May 2013 VA examination, who are medical professionals, found that there was no laxity in the right knee. Based on the foregoing, the objective medical evidence shows that the Veteran's right knee is stable without instability or subluxation prior to May 9, 2013. Accordingly, a separate rating for instability or subluxation of the right knee under Diagnostic Code 5257 is not warranted prior to such date.

The Board has also considered whether a separate rating under Diagnostic Code 5003 is warranted during the course of the appeal as early stage DJD of the right knee was shown on X-ray in February 2005. Diagnostic Code 5003 provides that degenerative arthritis established by X-ray findings will be rated on the basis of limitation of motion under the appropriate diagnostic code(s) for the specific joint(s) involved. When, however, the limitation of motion of the specific joint(s) involved is noncompensable under the appropriate diagnostic code(s), a 10 percent rating is for application for each such major joint or group of minor joints affected by limitation of motion, to be combined, not added under Diagnostic Code 5003. Limitation of motion must be objectively confirmed by findings such as swelling, muscle spasm or satisfactory evidence of painful motion. In the absence of limitation of motion, a 10 percent evaluation is warranted if there is X- ray evidence of involvement of two or more major joints or two or more minor joint groups and a 20 percent evaluation is authorized if there is X-ray evidence of involvement of two or more major joints or two or more minor joint groups and there are occasional incapacitating exacerbations. As the Veteran has already been awarded a 10 percent rating based on painful, limited motion, assigning a separate 10 percent rating under Diagnostic Code 5003 would constitute pyramiding as he would be compensated twice for the same symptomatology. 38 C.F.R. § 4.14; Esteban, supra. Moreover, as there is no X-ray evidence of involvement of two or more major joints, a 20 percent rating is not warranted under Diagnostic Code 5003.

The Board has also considered whether the Veteran is entitled to a separate or rating for right knee ankylosis, impairment of the tibia or fibula, and/or genu recurvatum. However, because the evidence of record, to include the lay and medical evidence, fails to demonstrate such symptomatology, the Veteran is not entitled to an increased or separate rating under Diagnostic Codes 5256, 5262, or 5263, respectively. 

The Board notes that the Veteran's in-service meniscectomy resulted in scarring; however, as noted by the May 2013 VA examiner, such scars were not painful and/or unstable, and the total area of all related scars were not greater than 39 square centimeters. Therefore, the Board finds that a separate rating for scarring is not warranted. 

C. Other considerations

The Board has considered whether staged ratings under Fenderson, supra, are appropriate for the Veteran's service-connected headaches and right knee for the relevant time periods on appeal; however, the Board finds that his symptomatology has been stable throughout the appeal period. Therefore, assigning staged ratings for such disabilities is not warranted. 

Additionally, the Board has contemplated whether the case should be referred for extra-schedular consideration. An extra-schedular disability rating is warranted if the case presents such an exceptional or unusual disability picture with such related factors as marked interference with employment or frequent periods of hospitalization that application of the regular schedular standards would be impracticable. 38 C.F.R. § 3.321(b)(1). 

In Thun v. Peake, 22 Vet. App. 111, 115-16 (2008), the Court explained how the provisions of 38 C.F.R. § 3.321 are applied. Specifically, the Court stated that the determination of whether a claimant is entitled to an extra-schedular rating under 
§ 3.321 is a three-step inquiry. First, it must be determined whether the evidence presents such an exceptional disability picture that the available schedular evaluations for that service-connected disability are inadequate. In this regard, the Court indicated that there must be a comparison between the level of severity and symptomatology of the claimant's service-connected disability with the established criteria found in the rating schedule for that disability. Under the approach prescribed by VA, if the criteria reasonably describe the claimant's disability level and symptomatology, then the claimant's disability picture is contemplated by the rating schedule, the assigned schedular evaluation is, therefore, adequate, and no referral is required.

Second, if the schedular evaluation does not contemplate the claimant's level of disability and symptomatology and is found inadequate, the RO or Board must determine whether the claimant's exceptional disability picture exhibits other related factors such as "marked interference with employment" and "frequent periods of hospitalization." Third, when an analysis of the first two steps reveals that the rating schedule is inadequate to evaluate a claimant's disability picture and that picture has attendant thereto related factors such as marked interference with employment or frequent periods of hospitalization, then the case must be referred to the Under Secretary for Benefits or the Director of the Compensation and Pension Service to determine whether, to accord justice, the Veteran's disability picture requires the assignment of an extra-schedular rating. Id.

The Board has carefully compared the level of severity and symptomatology of the Veteran's service-connected right knee disability and headaches with the established criteria found in the rating schedule. The Board finds that the Veteran's symptomatology is fully addressed by the rating criteria under which such disabilities are rated. 

In this regard, the Veteran's 10 percent rating for the right knee contemplates the functional limitations caused by his right knee pain. In sum, the Veteran's symptoms, and their resulting impairment, are contemplated by the rating schedule. The diagnostic codes in the rating schedule corresponding to disabilities of the back provide disability ratings on the basis of limitation of motion. For all musculoskeletal disabilities, the rating schedule contemplates functional loss, which may be manifested by, for example, decreased or abnormal excursion, strength, speed, coordination, or endurance. 38 C.F.R. § 4.40; Mitchell v. Shinseki, 25 Vet. App. 32, 37 (2011). For disabilities of the joints in particular, the rating schedule specifically contemplates factors such as weakened movement; excess fatigability; pain on movement; disturbance of locomotion; and interference with sitting, standing, and weight bearing. 38 C.F.R. §§ 4.45, 4.59; Mitchell, 25 Vet. App. at 37. In summary, the schedular criteria for musculoskeletal disabilities contemplate a wide variety of manifestations of functional loss, to include the resulting impact on the Veteran's physical activities. 

Furthermore, the currently assigned 30 percent rating for the Veteran's headaches contemplate the frequency, duration, and severity of such disorder, to include the associated symptomatology of nausea, photophobia, and phonophobia. Furthermore, a higher 50 percent rating is available for more severe headaches with a resulting impact on a claimant's economic adaptability.

Furthermore, the Board notes that under Johnson v. McDonald, 762 F.3d 1362 (Fed. Cir. 2014), a Veteran may be awarded an extra-schedular rating based upon the combined effect of multiple conditions in an exceptional circumstance where the evaluation of the individual conditions fails to capture all the symptoms associated with service-connected disabilities experienced. However, in this case, even after affording the Veteran the benefit of the doubt under Mittleider v. West, 11 Vet. App. 181 (1998), there is no additional impairment that has not been attributed to a specific, rated disability. 

Therefore, the Board finds that the rating criteria reasonably describe the Veteran's disability level and symptomatology of his service-connected disabilities. As such, the Board finds that the rating schedule is adequate to evaluate the Veteran's disability picture. Therefore, the Board need not proceed to consider the second factor, viz., whether there are attendant thereto related factors such as marked interference with employment or frequent periods of hospitalization. Accordingly, this is not an exceptional circumstance in which extra-schedular consideration may be required to compensate the Veteran for disability that can be attributed only to the combined effect of multiple conditions. Consequently, the Board concludes that referral of this case for consideration of an extra-schedular rating is not warranted. Id.; Bagwell v. Brown, 9 Vet. App. 337, 338-39 (1996); Floyd v. Brown, 9 Vet. App. 88, 96 (1996). 

Finally, the Board acknowledges the holding in Rice v. Shinseki, 22 Vet. App. 447 (2009), that a TDIU claim is part of a claim for a higher rating when such claim is raised by the record or asserted by the Veteran. In this case, however, the record does not suggest, and the Veteran does not allege, that his service-connected headache and right knee disabilities have rendered him unemployable. While the Veteran was approved for FMLA leave due to his headache disability, the record shows that the Veteran is employed for the postal service as a mail carrier and has remained employed throughout the course of the appeal. As such, Rice is inapplicable to this case and need not be further addressed.

In sum, Board finds that the preponderance of the evidence is against the Veteran's claim for a higher initial rating for his right knee disability and, while an initial rating of 30 percent for the entire appeal period is warranted for his headaches, the preponderance of the evidence is against an even higher initial rating for such disability. Therefore, in denying such increased ratings, the benefit of the doubt doctrine is not applicable and the claims must be denied. 38 U.S.C.A. § 5107; 38 C.F.R. §§ 4.3, 4.7.

ORDER

An initial 30 percent rating, but no higher, for migraine headaches is granted, subject to the laws and regulations governing payment of monetary benefits.

An initial rating in excess of 10 percent for residuals of meniscus tear of the right knee prior to May 9, 2013 is denied.



____________________________________________
A. JAEGER
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs